Denio, Ch. J.
 

 Prior to the enactment of the statute of 1849, which authorizes the creation of corporations by the act of the parties, without the intervention of the legislature, for the purpose of carrying on the business of insurance, a great number of corporations had been formed, under special legislative charters, for transacting that business upon what is called the mutual principle. Though there was considerable diversity in the provisions of some of these charters, the modes in which the principle of mutuality was sought to be worked out were two only. By one of them, the parties insured were to deliver to the officers of the corporation their several notes, called premium notes, for such sums as might be determined by the directors, and to pay down a small part of these notes, not exceeding five per cent. The balance of the notes was to stand as a security for the payment of any losses which might occur, and of the expenses of the business, over and above the amount to be paid down. For this purpose the notes were to be assessed, whenever occasion should require, in proportion to their respective amounts. The plan required that the premium notes should each bear the same proportion to the amount insured, where the hazard was equal, and that they should be of such an amount as in the aggregate to cover the losses which, upon any probable contingency, might happen; but, to guard against an error in that respect, there was a power to call in from the insured persons one dollar upon every hundred of the amount insured, in addition to the full amount of the premium notes. It was upon this scheme that the Jefferson County and the Madison County Insurance Companies were
 
 *308
 
 formed.
 
 (Laws
 
 of1836,42;
 
 id.,
 
 89.) And during the same and subsequent sessions of the legislature, a great many other companies were created, in which the charters of these companies were adopted by a simple reference to them The other method of carrying on the plan of mutual insu ranee was exemplified in the charters of a great number of corporations, located for the most part, but not wholly, in the city of New-York. The first of these was the Mutual Safety Insurance Company.
 
 {Laws of
 
 1838, 217.) The insured in this and similar companies were to pay their premiums in cash; and the money thus realized, over and above the amount required to be paid out for losses and expenses, was to be invested in safe securities and to accu muíate. A reckoning was to be made annually, and each member was to be credited with a part of the profits realized in proportion to the amount of premiums paid by him, an« to have a certificate thertefor in the books of the corporation These profits, however, were not to be drawn out at once but were to remain as a security for future losses. In these companies the members would not actually receive theii shares of the profits until the expiration of the charter or the dissolution of the corporation; but by the acts incorporating' some of the other companies of this class, the certificates were to be paid, in the order of the time when they were issued, out of the accruing profits, after a certain large amount had been realized and invested. In the United Insurance Company this amount was fixed at $500,000.
 
 (Laws
 
 of1840, 262, §11.) Charters containing these general features, with certain modifications not material to the present purpose, continued to be granted by the legislature, till the Atlantic Mutual Insurance Company was incorporated in 1842, when a new feature was introduced. As this provision has been the subject of repeated adjudications, which are supposed to have a bearing upon the present questions, it is given entire. “ The company, for the better security of its dealers, may receive notes for premiums, in advance, of
 
 *309
 
 persons intending to receive its policies, and may negotiate such notes, for the purpose of paying claims or otherwise, m the course of its business; and on such portions of said notes as may exceed the amount of premiums paid by the respective signers thereof, at the successive periods when the company shall make its annual statements, as herinafter provided for, and on new notes taken in advance thereafter, a compensation to the signers thereof, at a rate to be determined by the trustees, but not exceeding five per cent per annum, may be allowed and paid from time to time.”
 
 (Laws of
 
 1842, 261, §12.) The subsequent charters of this class generally contained this provision. For other examples of this method of insurance, see
 
 Laws of
 
 1840, 259;
 
 id.,
 
 1841, 195, 196, 229;
 
 id.,
 
 1842, 263, 301, 373, 387;
 
 id.,
 
 1843, 50, 65, 66, 71, 73, 199, 275, 285.
 

 No considerable capital or fund was required to be possessed by the corporations of either class as a preliminary to the commencement of the business. In the Jefferson County and Madison County Mutuals, and in those of that class, it was forbidden to issue policies until applications had been made for insurance for at least $50,000; the companies of the other-class were required to have applications, in some instances, for the insurance of $500,000; for others, of $250,000 before they could commence business. The premiums, at the usual rates, upon even the largest of these sums, would be too small to indemnify the insured against any considerable loss. But the theory was that the parties were mutually insurers of each other, and if the premium notes in one case and the rates of insurance in the other were fixed at a sufficiently large amount, there was not, apparently, any fault in the arrangement, especially if a large business could be at once entered upon. The provision above quoted, allowing notes to be taken as premium, in advance, would tend to strengthen the companies to which it was applicable.
 

 As to the government of these corporations, there being, properly speaking, no stockholders, it was intrusted to
 
 *310
 
 directors chosen
 
 by
 
 parties holding policies, or, in the later of the New-York mutuals, by policy holders and parties having certificates of profits; and all policy holders were declared members of the respective corporations.
 

 By the foregoing outline it will be seen that the principle of mutual insurance, as it was known to the laws of this state prior to the passage of the general act of 1849, con • sisted in the association of individuals for the purpose of insuring each other. The association was not to have any dealings in regard to insurance except with its own members Each one of these members was to be insured, and to b< indemnified, in the case of a loss, at the expense of all thi other members. The advantage which the individual associates would derive would consist in the ability to procure their property to be insured for a price which would not exceed the actual amount of the risk and their respective proportions of the expenses of transacting the business. The profit, which, in other cases, the assured party pays to the capitalists who invest their money in the business, would be saved. The general principle was precisely the same in both classes of companies which have been mentioned. In the first class the associates were never to be called upon to pay money except for actual losses and necessary expenses. In a period sufficiently long to annul the effect of favorable or unfavorable coincidences, and supposing the management to be perfect, the amount so paid would be precisely identical with the actual hazard insured against and the just share of the expenses. In the other class of companies, although the associates might be obliged, in the first instance, to pay more, money than the real value of the risk, in order to make the company safe and strong, the excess would be returned them in the form of profits, which, although not immediately realizable, would be managed and accumulated for their benefit, and, if not absorbed in subsequent losses would be eventually paid to them or their representatives It should be remembered that, in all the special charters'.
 
 *311
 
 which have been referred to, the first set of directors were named. The legislature must, therefore, be supposed to have known the individuals in whose hands they reposed the powers contained in the several charters, and who were to set the respective corporations in motion, and, for a time at least, to superintend their operations. The constitution of 1846 forbade the ganting of special charters, unless in exceptional cases; and, if this business of mutual insurance were to be continued by the creation of other corporations, it would become necessary to provide for their creation by a general law; and this was done by the adoption of the' statute of 1849, the construction of which, in several particulars, raises the questions which we are now called upon to determine.
 

 The present action is brought to recover the amount of a note made by the defendant for the purpose of assisting to form a mutual insurance company under the act. The fifth section declares that no mutual insurance company shall commence business, out of New-York and Kings county, until agreements shall have been entered into for insurance, the premiums on which shall amount to $100,000, nor until notes shall have been received for such premiums, payable at the end of or within twelve months from the date thereof; and it is declared that the notes so taken shall be deemed valid, and shall be negotiable and collectable for the purpose of paying any losses which may accrue or otherwise. By the eleventh section, provision is made for verifying, by means of an examination, the existence and the possession by the company of these notes; and the evidence furnished by such examination, together with the charter, is declared to be the authority of the company to commence business and to issue policies. The answer admits that the note sued on was one of those which were furnished for the purpose of complying with the provision referred to; that it was produced to commissioners who made the examination required by the eleven I h
 
 *312
 
 section, its number and date being then blank. This examination was made on or prior to the 9th day of August,
 
 1850;
 
 for the certificate of the commissioners is dated
 
 on
 
 that day. Subsequently, it is stated, and on the sixteenth day of the same month, the defendant took out a policy of insurance of the company, upon property valued at $500, and in that instrument the note and the sum of $2 was stated as the consideration upon which the company assumed the risk, and the note was then filled up with the number of the policy and its date. Prior to this, a charter had been agreed on and approved by the attorney-general, and a code of by-laws had been formed, respecting which it is sufficient to say that they contemplated and provided for conducting the business upon the system of notes to be given by the insured, which were not to be paid or collected at all events, or to be negotiated, but which were to operate as guarantees for the payment of such' share of the losses and expenses, not exceeding the amount of the notes, as the makers might be legally called upon to pay. In this respect, the plan of the Jefferson County and the Madison Company charters is substantially adopted, though it is not carried out with the same precision and particularity as in these charters. The general act of 1849 does not prescribe the manner in which the business of mutual insurance shall be carried on by the mutual companies which are to be created under it.
 
 The
 
 allusion to it as a peculiar system is as the plan of mutual insurance, and the companies which are to be conducted upon this system are distinguished from those having a capital stock only by being called mutual insurance companies, or mutual companies. The particular mode of operation was left to be provided for by the charter which should be adopted by the associates, subject to be approved of by the attorney-general, who was to see that it is not in violation of the constitution or of any law. I shall presently have occasion to state my views of what such a charter may lawfully contain. It is sufficient here
 
 *313
 
 to say that I entertain no doubt bat that the charter of. the Union Company is legal, in so far as it provides for premium notes intended as guarantees, to be available only to the extent of the proportion of losses and expenses properly chargeable thereon. The question to be determined in this case is, whether the note sought to be recovered is to be considered as payable absolutely, or whether it is to be taken to be a guaranty, and only recoverable to the extent of a just proportion of the losses and expenses. If it belongs to the last mentioned class of notes, the plaintiff was- bound to show that it had been assessed for losses properly chargeable upon the defendant in respect to it; and the defendant would be at liberty to show, if he were able, that the whole or a part of the amount claimed was for losses arising out of a business which the directors, had no right to transact. If the note' was payable absolutely, there was no occasion for an assessment, for, the corporation being insolvent, the receiver is entitled to enforce all the securities belonging to it for the purpose of paying its debts.
 

 I am of opinion that the note was absolute, and payable at all events without an assessment. The language of the fifth section does not admit of any other interpretation. It seems to me to be chosen with a view to distinguish the notes to be given from such as would operate merely as guarantees, and require an assessment. They are to be given for premiums in advance upon risks contracted to be taken. They are to be considered as capital. They are to be valid, that is operative, of themselves, and not on account of the happening of another event, such as the occurrence of losses. They are to be negotiable, and may therefore be indorsed and transferred by the corporation at its pleasure; and they are to be collectable, and may be sued for and recovered, when they have matured. They may, moreover, be transferred or collected, not only to pay losses, but otherwise, that is, to obtain money for any other lawful
 
 *314
 
 purpose. This language cannot, in my opinion, be otherwise understood than as describing ordinary promissory notes, available for all the purposes for which such notes are usually available.
 

 The apparent purpose of the provision leads to the same conclusion. The public interest required that these com panies should be useful institutions, and; to be such, they ought to be strong and safe. The first class of mutual companies which have been mentioned transacted only a limited business, because, they had no fund for the payment of losses, and could only liquidate them by means of assessments upon a large number of guaranty notes. The collection of these assessments was a slow and uncertain operation, and did not answer the purpose of parties entitled to indemnity. The companies of the other class had nearly all failed from a similar defect, the want of an available fund for the payment of losses. In the companies which the legislature was about providing for, there was an additional reason for requiring proper safeguards. They might be organized by anybody, and upon any motives. No public authority was required to pass upon the charactei or circumstances of their undertakers. There existed, therefore, a good reason, arising out of the history of mutual insurance in this state, as well as from the nature of the case, for requiring a fund, if not in cash or safe investments, at least in obligations payable absolutely, and immediately available for the indemnity of citizens who should become members by insuring in such companies. I conclude, therefore, that these notes were intended to be actual securities for the money mentioned in them, and that it was intended that they should be, or at least might be, collected at maturity, and that the amount, if not immediately needed for expenditure, should be invested in more safe and permanent securities, according to the provisions of the eighth seetion of the act. The equivalent which the makers of the notes were to have, as a consideration for giving them, was
 
 s
 
 right
 
 *315
 
 to be insured in the company for such an amount that the premiums would absorb the amount of the notes. When this should be done, and the notes should be paid," that part of the transaction would be consummated. If the defendant’s theory of the effect of these notes is correct, this consequence would follow: When the term of insurance which the makers of the notes should effect had' expired, and the losses, if any, arising during that period, had been adjusted, the notes would be given up, and the capital or fund which the legislature had thus provided would be gone. The defendant, for instance, took out a policy for one year. If the other makers of the $100,000 of notes did the same, these notes would all become inoperative at the end of the year, except for the payment of the losses which had arisen during that time. The company would afterwards proceed under the guaranty note system, and without any other capital or fund. The legislature, I am persuaded, did not intend merely to reproduce that system. They designed to provide for a safer and a better one, by requiring securities in the nature of invested capital, which should be available to pay all losses.
 

 I do not attach any importance to the fact that the defendant, after having exhibited his note to the commissioners appointed by the comptroller, or suffering it to be done, took out a policy by which he was insured upon property of the same value as the amount of the note. The note had the effect declared by the statute, when, after being signed and delivered, the company had become organized for the transaction of business, and that effect was not impaired by what was subsequently done respecting this policy It was, probably, then considered that it was a deposit or guaranty note; but this was an error in matter of law, and does not prejudice the plaintiff.
 

 There is a striking similarity in intention between the provision under which the note was given and the section which I have quoted from the charter of the Atlantic
 
 *316
 
 Mutual Insurance Company, and which section is repeated in all the subsequent charters of that class. Under both enactments the notes are to be given for premiums, i» advance, and the purpose, in each case, is to afford bette/ security to the dealers than they would otherwise have The possession of the notes, with the right in the compani to regulate or collect them, affords, in both cases, a kind of fund out of which losses may be paid. The only perceptible difference is, that for the notes, given pursuant to thk provision in the special charter, the signers are to receive
 
 t
 
 compensation out of the profits, while there is no such pro vision in regard to the notes given under the general law, but in these cases the makers are the parties engaged in getting up the companies, and are supposed to find theii advantage in the success of the enterprise. Now, the note? given under the aforesaid twelfth section have frequentl} been before the courts, and it is perfectly well settled in the courts of original jurisdiction, and in this court, that they are payable absolutely, and may be collected without any allegation of losses and without an assessment.
 
 (Furniss
 
 v.
 
 Gilchrist,
 
 1
 
 Sandf.,
 
 53;
 
 Brouwer
 
 v.
 
 Hill, id.,
 
 629;
 
 The same
 
 v.
 
 Appleby, id.,
 
 158;
 
 Hone
 
 v.
 
 Allen, id.,
 
 171;
 
 Hone
 
 v.
 
 Folger, id.,
 
 .177 ;
 
 Caryl
 
 v.
 
 McElrath,
 
 3
 
 id.,
 
 176;
 
 Deraismes
 
 v.
 
 Merchants' Mutual Insurance Co.,
 
 1
 
 Comst.,
 
 371;
 
 Howland
 
 v.
 
 Meyer,
 
 3
 
 id.,
 
 290;
 
 Brown
 
 v.
 
 Crooke,
 
 4
 
 id.,
 
 51;
 
 Emmet
 
 v.
 
 Reed,
 
 4
 
 Seld., 312.)
 

 The result of these views is that the judgment should be affirmed.
 

 All the judges, except Paige, J., who expressed no opinion, concurred
 

 Judgment affirmed.