Selden, J.
It appears from the report of the referee in this case, that the defendants were organized as a mutual insurance company, under the gen *58 eral act of 1849; that the policy upon which the suit is brought was duly issued, and the premium paid; that all the conditions on the part of the insured were kept and performed; that the property was destroyed by fire, as set forth in the complaint, and that the demand arising from the loss had been assigned before, suit brought, to the plaintiff. The defence which prevailed at the trial, and which is relied upon here, is, that the defendants having been organized as a mutual company, had no authority to issue policies for premiums to be paid in cash, and, consequently, that their act in issuing the policy in question was ultra vires, and the policy void.
I shall assume, for the purposes of this case, that the defendants can avail themselves of this defence, and that they are in no .manner estopped from insisting upon their own want of power.[2] The question then is, did the defendants exceed their corporate powers by issuing this policy and receiving the premium upon it ?
The charter adopted by the defendants, which was introduced and proved upon the trial, contained the following clause: “ Any person applying for insurance, so electing, may pay a definite sum in money, to be' fixed by said corporation, in full for said insurance, and in lieu of a premium note.” The policy *in question here was issued in strict accordance with this provision. The defendants, therefore, .to sustain their defence, must *59 show that the company had no authority to insert such a clause in its charter; and this depends entirely upon the provisions of the act of 1849, under which the company was organized.
By § 3 of that act, it is enacted, that persons intending to become incorporated under it, “ shall file in the office of the secretary of state a declaration, signed. by all the corporators, expressing their intention to form a company for the purpose of transacting the business of insurance, as expressed in the several subdivisions of the first section of this act, which declaration shall also comprise a copy of the charter proposed to be adopted by them; ” and § 10 provides that “ it shall be the duty of the corporators of any and every company organized under this act, to declare in the charter, which is herein required to be filed, the mode and manner in which the corporate powers given under and by virtue of this act are to be exercised.”
Thpse provisions confer upon the companies organized under the act a broad and unrestricted power to prescribe for themselves the manner in which they will conduct the business of insurance. They virtually transfer to these companies full legislative control over the subject, and, construed by themselves, would invest each company, whether joint-stock or mutual, with power to provide for every kind of insurance authorized by the act. The only expressed limitation upon this power, is contained in § 11, which requires that the charter “ shall be examined by the attorney-general,” who, if he finds it “ to be in accordance Avith the requirements ” of the act, “ and not inconsistent Avith the constitution or Iravs of this state,” is to “ certify the same to the comptroller,” &e. It cannot be pretended, that the clause in the defendants’ charter, under which this policy Avas issued, is in any manner repugnant either to the constitution or the general haws of the state; the only question, therefore, is, Avhether it is in conflict Avith anything contained *60 in the act of 1849 itself. Unless the defendants can find ^something in. that act which, prohibits companies organized as mutual companies from receiving their premiums in cash, they cannot maintain their defence.
There is clearly nothing in the terms of the act which contains such a prohibition; but the restriction is sought to be deduced by implication from those provisions of the act which discriminate between joint-stock and mutual companies. It is based mainly upon §§ 3, 4 and 5. The charter, which persons wishing to become incorporated are required by § 3 to file, is, as we have seen, to prescribe “ the mode and manner ” in which their “ corporate powers ” are to be exercised; § 4 authorizes the company, after filing such charter, “ to open books for subscription to the capital stock of the company,” * “ or, in case the business of such company is proposed to be conducted on the plan of mutual insurance, then to open books to receive propositions,” &c. It is then provided (§ 5) that no “joint-stock company” shall bo organized in the city of New York, or the county of Kings, with a smaller capital than $150,000, nor in any other county, with a smaller capital than $50,000; and that no company formed for the purpose of doing business “ on the plan of mutual insurance,” in either of the counties of New York or Kings, shall commence the- business of fire or inland navigation insurance, until agreements have been entered into for insurance, with at least one hundred applicants, the premiums on which shall amount to $200,000, nor in any other county, until such premiums. shall amount to $100,000, for which premium notes'are to be taken “ in advance,” as a “ part of the capital stock ” of the company.
Now, the argument on the part of the defendants is, that there having been in this state, previously to the act of 1849, two distinct and well-known classes of insurance companies, viz., joint-stock and mutual companies, *61 organized upon different principles, and transacting their business in different modes, it was the_ evident design of the legislature, as evinced by the provisions to which I have referred, to keep these two classes of companies entirely distinct, and to prevent any intermingling *of the two modes of insurance in the same company; that insuring for a specific premium, payable in cash, is the appropriate business of a joint-stock company, organized with a view to profit upon its capital, the corporators in in Which consist, not of the persons holding policies, but of the owners of this capital; that a mutual insurance company is composed exclusively of the persons insured, and is organized by its members, not with a view to profit, but for the solo purpose of mutually insuring each other; that it is essential to such a company, that every person insured should be a member of the company, and an insurer of all the other members, as well as insured by them; and that one who pays the premium upon his policy in cash, and is liable for nothing more, does not become a member of the company, and is in no sense an insurer of others holding its policies; that there is no mutuality, therefore, between such a person and those who have given premium notes, liable to be assessed for future losses; and hence, that issuing policies for cash premiums, is a departure from the legitimate business of a mutual insurance company, and subversive of that distinction between joint-stock and mutual companies which it was the design of the legislature to preserve.
This argument, it will be seen, consists of two branches, viz.: 1. Of that construction of the act of 1849, which holds that a strict line of demarcation was intended to be drawn between the two classes of companies, and that when a company had once made its election to organize, either as a joint-stock or a mutual company, it was the object of the act that it should be ever thereafter rigidly confined to that mode of insurance which is appropriate to its class. 2. Of the assumption that there is some *62 thing in the taking of a specific cash premium in full for insurance, without further liability on the part of the in- • sured, which is repugnant to .the nature and principles of a mutual insurance company. The defendants are under the necessity of maintaining both these propositions; if they fail in respect to either, they fail in their defence. If evidence of that inflexible determination to keep the ^W0 ^n<^s companies entirely distinct, for which the defendants contend, *is not to be found in the act; or if the taking of a cash premium in full for the insurance can be reconciled with the “ mutual principle,” as it is called, then, of course, there is no objection to this policy.
Let us examine these two points separately. On what does the assumption of such a determination on the part of the legislature rest' ? There is clearly no good reason why the legislature should have provided for so rigid a separation of the two species of insurance companies. That it was never supposed there was any ground of policy which required that mutual insurance companies should be prohibited from receiving cash premiums, is conclusively shown by the course of legislation on the subject. Acts have been repeatedly passed, conferring upon such companies this power, in the precise terms used by the defendants in their charter. It was conferred upon the Albany County Mutual Insurance Company in 1848; upon the Herkimer County Company in 1850, and upon various other companies in subsequent years. The legislature seems to have been ever ready, upon request, to authorize these companies to receive their premiums in cash, instead of premium notes.
There is no public reason why such a company, when it has once acquired a substantial basis for its business, should be rigidly confined to the mutual system. That system was not devised by the legislature for the protection of the public, but by individuals for their private benefit; it does not rest upon any foundation of public *63 policy. Wiiy, then, should the legislature, when enacting a general law, providing for the organization of all insurance companies, so adjust its provisions as to inhibit mutual companies from transacting any portion of their business in a manner which has so often received the legislative sanction ? The very object of the law being to ■ prevent the necessity of repeated applications to the legislature, by those desirous of engaging in the business of insurance, we should naturally expect its provisions to be so framed as to enable mutual companies, under proper guards and restrictions, to avail themselves of that privilege which the legislature has *shown itself in so many instances' ready to confer; a contrary inteiifc ought certainly to be made very clearly to appear, before its existence is assumed.
The question, then, upon this point, is, whether those provisions of the act of 1849, already referred to, discriminating to some extent between joint-stock and mutual companies, exhibit an implied intention to prohibit mutud companies from issuing bash policies. It is indispensible for the defendants to maintain the affirmative of this; because, as the power of the companies, under § 10, to frame their own charters, is conferred in unrestricted terms, they may, of course, provide for this class of business, unless the limitation of this power, upon which the defendants insist, is elsewhere found; and there is no portion of the act, other than that referred to, from which such limitation can by possibility he deduced.
But the discrimination in §§ 4 and 5, between the two classes of companies, had another obvious purpose, which was fully answered, when the respective companies were once organized and ready to commence their operation a
Tiie main reliance of all insurance companies for the payment of losses, after becoming once fairly established, is upon the sums received for premiums. But losses may occur before their accumulations from this source are sufiicient to meet thorn; for this reason, it was deemed wise *64 and prudent on the part of the legislature, to provide that every insurance company, whether joint-stock or mutual, should have, at the outset, a fund sufficient to meet its early losses; and as mutual companies have not, like joint-stock companies, a cash capital, it became necessary, in arranging the provisions on this subject, to discrimi note between the two.
That this was the sole object of the discrimination in question, to me seems plain; §§ 4 and 5 relate to this preliminary fund, and to nothing else. They require a joint-stock company, in the country, before commencing business, to have a cash capital of $50,000, and a mutual company a capital of $109,000, composed of promissory notes given in advance for premiums. These notes would represent risks incurred, or to bo incurred, while the cash capital would not ; and hence the difference *in amount; the legislaturc evidently considered the $100,000 in notes equivalent to $50,000 in cash. What reason can there be, after the companies are once formed, with such a preliminary fund, pronounced adequate by the legislature., why a mutual company should not, as well as a joint-stock compairy, if it chooses to incur the risk, issue cash policies. The public and all those who deal with the company have the same security in the one case as in the other; they have the same preliminary fund, and the v, une accumulations from the premiums received. The question of receiving cash premiums in full for policies, after a company has once obtained a sufficient capital to justify it in commencing business, is a question for the consideration, not of the legislature or the public, but of the corporators themselves; the public have no special interest in it. The premiums received, if graduated upon just and proper principles, will strengthen one of these companies to precisely the same extent as the other, and will afford the same- additional guaranty to parties insured, for the payment of losses.
*65 We see, therefore, very plainly, why every mutual company, once established, which’ has asked of the legislature the favor, has obtained the power to issue cash policies; and we can hardly fail also to see that when the legislature, in the act of 1849, had provided that all mutual companies should have a sufficient fund upon which to begin their operations, they might safely bo allowed, as by § 10 they are allowed, to prescribe for themselves the mode and manner in which they would conduct their business. This construction gives full force and effect to every provision of the act of 1849, and exempts the legislature from the imputation of having so framed a statute, designed expressly to render such applications unnecessary, as to require in every instance a special application for a favor which reason and the practice of the state alike show it would be a matter of course to grant.
But this is not all. The statute bears upon its face unequivocal evidence that the legislature did not intend to erect an impassable partition-wall between the two kinds of companies; *§ 21. provides as follows: “ It shall be lawful for any mutual company, established in' conformity with the provisions of the 4th section of this act, to unite a cash capital, to any extent, as an additional security to the members, over and above their premiums and stock-notes, which additional cash capital shall be left open for accumulation, and shall be loaned and invested, as provided in the 8th section of this act, and the company may allow an interest on such cash capital and a participation in its profits, and prescribe the liability of the owner or owners thereof to share in the losses of the company; and such cash capital shall be liable, as the capital stock of the company, in the payment of its debts.”
It has been suggested, that this 'is a mere authority to borrow money; but this idea can hardly be„-reconciled with the provisions of the section. If the contributors of the additional fund are “ to participate in the profits ” of the business, and if the fund itself is “ liable, as the capital *66 stocle of the company,”,to the payment of its debts, then such contributors are, to all intents and purposes, partners in the company, and not its creditors.[2] The section authorizes the company “ to prescribe the liability of the owner or owners ” of the additional capital to share in the losses of the company; but if the money is borrowed, it would belong to the company itself, and not to the contributors, as this provision plainly contemplates. Again, the fund is to be “ kept open for accumulation;” this cannot mean that the company shall continue to borrow; it can only mean that additions may be made, from time to time, to the subscribed capital, it being assumed that every such addition would strengthen the company. The whole section exhibits an intent that those who contribute the additional capital should be associates in and not creditors of the company; and any other supposition is inconsistent Avith its language and structure.
It is true, as has been said, that no such cash capital Avas added by the defendants to the funds of this corporation; but the section has, nevertheless, a most important bearing upon that Avhich is made the turning point in the Presen* case> The *whole argument on the part of the defendants, rests upon the assumption that an intent is to be gathered by implication from the general act of 1849, that there should be no intermingling of the tAvo modes of insurance, in the same company. Noav, § 21 conclusively proves the contrary; it shoAvs even a solicitude on the part of the legislature, 'by providing that the additional fund shall be left open for accumulation, to add the stock feature, and, of course, the system of cash premiums, to the mutual companies.
That the legislature contemplated the issuing of cash *67 policies to some extent, by all mutual insurance companies, is evident from the very sections upon which the argument on the part of the defendants is mainly based, The notes provided for in § 5, which constitute the capital upon which a mutual company is to commence their business, are not premium notes, to be assessed when losses occur; but are payable absolutely, irrespective of all losses; and so it was held by this court in the case of White v. Haight (16 N. Y. 310). They are the same, therefore, as so much money advanced to the company for premiums upon policies thereafter to be issued.[3] The idea of these notes was evidently borrowed from the charters of a class of mutual insurance companies, of which the Atlantic Mutual, chartered in 1842 was the type; § 12 of the charter of that company provides, that the company, for the better security of its dealers, may receive notes for premiums in advance, of persons intending to receive its policies; and may negotiate such notes, for the purpose of paying claims or otherwise, in the course of its business.” This was the first appearance in our statutes, of this mode of obtaining a preliminary fund, upon which to commence its business by a mutual insurance company, and it was adopted by the legislature in enacting the general law of 1849. The charter of the Atlantic Mutual clearly contemplated the re-payment of those advances, by the issuing of cash policies, because no provision was made for the issuing by that company of any other; and it is very clear, that the same mode of payment must have been contemplated, under the general law.
*My conclusion, therefore, would be, that if the policy in question is to be regarded as issued to a mere outside party, without any referentie in itself to the principles of mutnality, it would nevertheless be valid *68 and binding. If, however, we assume the contrary, and suppose it to'be indispensable that the mutual principle, as it is called, should be observed in all the policios issued by a mutual company, the result, I" think, would not be different.
It is somewhat difficult to ascertain with precision, in what this mutual principle, so strenuously contended for, is claimed to consist; as mutual companies have assumed a great variety of forms; hut I will suppose, for the purposes of this case, that it involves all the requirements suggested on the part of the defendants. The most prominent among the requisites insisted upon, as constituting a mutual insurance, is, that the party who is insured should thereby be brought into mutual relation with the insurers, by becoming a member of the company issuing the policy. It seems to be supposed, that this was not the case with the party to whom the policy in question here was issued. An examination, however, of the charter of the company will clearly show the contrary; articleV.,among other things,provides as follows: “The directors shall be elected by the persons holding policies of insurance in this cqmpany, or their proxies, and one vote shall be allowed on every $100 insured.” Thus, every person holding a policy issued by the company is made a member of the corporation, and entitled to a vote therein, entirely irrespective of the question whether the premium upon such policy was paid in money or by a premium note; and his interest is measured upon a principle which is perfectly equal and just, viz., by the aggregate amount insured.
If it be said, that mutuality also requires that there should ,be some sort of ratable equality between those who pay their “premiums in cash, and those who give notes, this is easily attained. When the present value of a life-annuit)r, or of a right of dower, is estimated upon principles which experience has established, the sum *69 arrived at is, in the eye of the law, just *equal to the contingent .interest which it represents. So, when the chances of liability upon a premium note-are. calculated upon principles similar, if not as exact, a sum is found which may be regarded as equivalent to the contingent liability upon the note; indeed, all premiums for insurance are calculated upon this principio. That equality may thus be produced, is conceded; but two answers are suggested. In the first place, it is said, that it is not slioAvn that the premium in this case was the result of any such calculation ; and that the presumption is, that it was not. Now, I am unable to see upon what foundation such a presumption can rest. I have supposed that, where a transaction would be legal, if done in one Avay, and illegal, if done in another, and there Avas no evidence on the subject, it Avas to be presumed to haAm been done according to hvw. Here, liOAvever, a presumption is to be raised in favor of this company, that it Avas guilty of a violation of laAv, to enable it to escape from the obligation of a contract, the consideration for Avhich it has received and still retains ; in my opinion, the presumption is directly opposite to that thus suggested. It Avas not necessary, that anything should appear in the charter or by-laAvs on this subject; it Avas a matter of calculation, to be adjusted upon fixing the premium.
The provision in the charter, hoAV'ever, as it seems to me, does imply that the premium Avas to be calculated upon the precise principle Avhich has been here suggested. The cash premium Avas to be “ in lieu of,” that is, Avas to take the place of a premium note. This implies, that it Avas to be made equal, to such note, Avhich,- for all substantial purposes, it Avould be, if calculated in the mode here pointed out.
The other ansAver given to this vieAV of the case is, that the principles of mutual insurance require that eA-ery person insured upon that plan should be also himself an insurer; that is, that each person insured nnut also be an *70 insurer of all his associates, as Avell as insured by them; and it is said, that an insured person Avho has paid a premium of a definite sum, in the language of the defendants' charter, “ in full for said insurance,” and avIio, tlierefore, is not responsible for anything more, ■"'cannot be a mutual insurer, because he is not in any sense an insurer at all. This argument is based upon what I regard as an erroneous víbav of the true distinctinction betAveen a mutual and a joint-stock company.
Indeed, much of the difficulty on the subject has been produced, by attaching a meaning to the Avord mutual, in its connection Avitli insurance, which does not belong to it. A mutual insurance company is simply a company Avhose fund for the payment of losses and expenses consists, not of a capital subscribed or furnished by outside parties, but of premiums mutually contributed by the parties insured. Angelí says—“ A mutual insurance, in its origin, aauis a body of persons, each of Avhom Avas desirous of effecting an insurance; and he agreed Avith the rest of the members to contribute the premiums to a common fund, on the terms that he should be entitled to receive out of that fund.” (Angelí on Fire and Life Insurance, §413.) There is not a Avord about the parties being insurers of each other, further than as they Avere made so by the payment of a cash premium; they made up a common fund, by means of their common or mutual contributions, upon AA^hich each had a claim for any loss in respect to the property insured; there was no responsibility beyond that, and this is all that is essential to a mutual company. The “ mutual principle,” as it is called, requires nothing more. Joint-stock companies have a subscribed capital; mutual companies do not, but depend upon their premiums; this is what distinguishes them; and Avhether the premiums are paid in cash, or by notes, has nothing to do Avitli the distinction.[4]
*71 Granting it, however, to be necessary that all those whe are insured in a mutual company should also he insurers; the person who took this policy was so; he became, as has been shown, a member of the company, and interested in its funds in proportion to the amount of his policy; and to the extent of that interest, he was an insurer of all other members.
It is no answer to this, to say that mutual companies contemplate only indemnity against loss, and not the accumulation of a fund to he divided among the corpora-tors. This depends *upon the manner in which they conduct their business; there is nothing to prevent a mutual company from carrying on its operations with a view to profit and dividends. Indeed, the act of 1849 plainly contemplates that they will, or, at least, that they may do so, when it provides in §21, that they may allow to parties contributing a cash capital, a “ participation in their (its) profits.”
But were this question not as clear upon principle, as I think it is, it may be regarded as settled by authority. What is claimed on the part of the defendants is, that issuing policies for premiums payable in money, is not appropriate business for a mutual insurance company, or, at all events, for one which also takes premium notes subject to assessment; that it assimilates such company to a joint-stock company, which the act of 1849 does not permit; and that there is a want of mutuality between those paying cash premiums, and those who give notes.
*72 These same questions received the deliberate examination of the Supreme Court of Ohio, in the case of The Ohio Mutual Insurance Company v. Marietta Woollen Factory (3 Ohio St. N. S. 348). The company, in that case, was incorporated in 1843; in 1844, an act was passed to amend the charter, which contained two sections; § 1 provided, in almost the same terms with the provision in the defendants’ charter, that any person applying for insurance might elect to pay “ a certain definite sum of money infull for such insurance,” which sum was to be “ in lieu and place of a premium note§ 2 devoted the funds arising from cash premiums and the premium notes, in general terms, to the payment of losses and expenses, saying nothing about assessments,but required the cash fund tobe first exhausted. The directors there took ground precisely analogous to that taken here, viz., that this change in the business of the company changed its character from “ a purely mutual joint company ”' to what they called “ a mutual stock company.” Hence, they disregarded the provisions in their charter, which subjected the premium notes to contribution for such losses only as should accrue while the ^makers were members of the company; and treated the cash premiums andpre" minm notes as joint capital, subject to be applied indiscriminately to all losses, except that the cash premiums were to be first exhausted. Banney, J., after stating this conclusion of the directors, said—“In this we think they were most clearly wrong; no such radical change is or was intended to be effected by this act. It was still a mutual insurance company, with no power in the directors to control its assets as an independent company, or to divert them from the purposes to which the law and the contract of the parties had appropriated them. Every person insuring, whether by the payment of a cash premium, or the deposit of a premium note, still became, a member of the company, and this act simply gave the election to him whether he become a member in the one way or the other.” Again, *73 lie says—“ The cash premium belongs precisely where the premium notes, whose place it takes, would belong; and is subject to the same appropriation, with this modification ; it must be first applied, and no part of it can be withdrawn upon the expiration of the policy, although it should not have been all expended. * * There is no difficulty in the practical toorking of this construction.”
This case decides every point raised by the defendants here; because, although, there, the taking of cash premiums was authorized directly by the legislature, yet, if this did not change the character of the company; if it was “ still a mutual insurance company; ” if those who paid cash premiums became “ members of the company and the premium paid took the place of a premium note; and if there is no practical difficulty in the working of such a system, then, there can be no objection to the adoption by the defendants of the clause in their charter which authorized it.
But the question, under our own statute, and in precisely in such a case as that now before us, has been passed upon by the Supreme Court of the United States in the case of the Union Insurance Company v. Hoge (21 How. 35). The company, in that case, was incorporated in this state, under the law of 1849, and its charter was identical with that of the ^defendants here; the action was brought upon a policy, the premium upon which had been paid in money. The case appears to hr.vo been elaborately argued, and among the objections made by the counsel for the company to the issuing of cash policies, is the following: “ That it destroys the principle of mutuality which is the leading characteristic of mutual companies, formed under the law of 1849, and confounds the operation of a company organized to do business on the mutual plan, with that of those companies which are organized on the plan of stock companies, and which are in their nature and principles antagonistic to the mutual companies.” On this point the court, by *74 Nelson, J., says—“ It is argued, however, that the company in question is a mutual insurance company, as declared by the act; that according to this system, the insured must be a member of it, and that a person insured upon a cash premium, without any further liability, cannot be a member. This argument is not well founded, either upon principle or authority. Admitting that the insured must be a member of the company, he is made so, by the payment of the cash premium. The theory of a mutual insurance company is, that the premiums paid by each member for the insurance of his property constitute a common fund, devoted to the payment of any losses that may occur. Now, the cash premium may as well represent the insured, in the common fund, as the premium note; and this class of companies has been so long-engaged in the business of insurance, it may well be, that they can well determine, with sufficient certainity for all practical purposes, the just difference in the- rates of premium between cash and notes. These mutual companies, possessing the authority contained in the 8th section of this charter, viz., to take cash premiums or premium notes, are, at the present day, in operation in several of the states, and it has never been supposed, that the mutual principle has been thereby abrogated.”
I have quoted thus largely from the opinion of Judge Nelson, because, in my view, the extract given answers so fully to every phase of the argument for the defendant here, that there is but little necessity for saying more. When it is considered, *that the term “mutual, ” . as applied to an insurance company, does not import any peculiar and exact method of producing mutuality, in the sense of equality among its members, but that it is simply significant of an association for the purposes of insurance, whose fund for the payment of losses, consists, not of a capital furnished by uninsured parties, but of the premiums mutually contributed by the persons insured, all difficulty on the subject is at an end. That *75 such is the import of the term appears, not only from the opinion of Judge Nelson, but from all the other authorities on the subject. The judgment in this case, should, I think, be reversed, and there should be a new trial, with costs to abide the result.

 Corporations may incur responsibilities by acts which are ultra vires. They may sometimes be estopped from asserting the invalidity of such contracts, and thus be practically bound by them. But that is not because the contracts are valid, but because it would be a fraud upon the other party to assert their invalidity. Earl, J., in Madison Avenue Baptist Church v. Oliver Street Baptist Church, 73 N. Y. 90. And see the opinion of Comstock, C. J., in Bissell v. Michigan Southern and Northern Indiana Railroad Companies, 22 Ibid. 258. “ It is now well settled, that a corporation cannot avail itself of the defence of ultra vires, when the contract has been, in good faith, fully performed by the other party, and the corporation has had the full benefit of the performance and of the contract.” Whitney Arms Co. v. Barlow, 63 N. Y. 70, Allen, J.

 As to the relation of the assured towards a mutual insurance company, see the remarks of Allen, J., in Cohen v. New York Mutual Life Insurance Co., 50 N. Y. 624; and of Bedle, J., in Mutual Benefit Life Insurance Co. v. Hillyard, 8 Vroom 474.

 And see Tuckerman v. Brown, 33 N. Y. 297; Rhinehart v. Allegheny County Mutual Insurance Co., 1 Penn. St. 359.

 The makers of premium notes may be assessed for losses incurred by members who pay the premiums in cash. Jackson v. Roberts, 31 N. Y. *71 304; Schimpf v. Lehigh Valley Mutual Insurance Co., 86 Penn. St. 373. A contract with a “ mutual ” company, however, being an agreement that the company will insure, in consideration of the assured’s agreement to contribute towards the payment of losses, no contract is binding upon the company until, the latter’s liability has become fixed. Shaffer v. Mutual Fire Insurance Co., 7 W. N. C. 385. As to the preliminary negotiations, the parties deal at arm’s length. Eilenberger v. Protective Mutual Fire Insurance Co., Ibid. 363. But the company may accept a promissory note for a cash premium. Farmers Bank v. Maxwell, 32 N. Y. 579; Cary v. Nagel, 2 Biss. 244.