For this reason judgment must be rendered for plaintiff on the demurrer, with leave to defendant to amend his answer in twenty days on payment of the costs to the demurrer.

## TUCKERMAN *a.* BROWN.

*Supreme Court, Sixth District; General Term, July,* 1860.

RECEIVER.—INSURANCE COMPANY.—CORPORATION.—WITHDRAWAL OF CAPITAL.

The objection that a plaintiff suing as receiver of a corporation does not show that his appointment was founded on a petition, does not apply where the receiver was appointed on consent of the corporation, in an action brought under section 40 of 2 Revised Statutes, 463.

Notes given to an insurance company, under section 5 of the general law, are absolute and payable at all events without an assessment. They are not contingent on the happening of losses.

Hence, when there are two departments in a company—one stock and one mutual —it is no defence to a note given on insurance in the mutual department, that all the losses in that department have been paid, and that the unpaid losses accrued in the other department.

A corporation cannot make a valid agreement with one who delivers to them securities to form a part of their original capital, and going to make up the amount of such capital required by law, that they will subsequently surrender

the same for a less security, which will not meet the requirements of the law. Such an agreement is a fraud upon the law.

The surrender and cancelling of such a security, in pursuance of the agreement, does not release the liability of the one who gave it to the corporation. To allow it to have effect would be to sanction a withdrawal of capital, contrary to section 1, of art. 1, tit. 2, chap. 18, part 1, of the Revised Statutes.

Motion for judgment on verdict.

The facts of the case are stated in the opinion.

*George T. Tuckerman,* for the plaintiff.

*Burditt & Lynes,* for defendant.

By the Court.*—Parker, J.—The New York Central Insurance Company was organized in the year 1851, under the general law of 1849 (*Laws of* 1849, ch. 308), for the purpose of making insurance on dwelling-houses, &c., against loss or damage by fire, as provided in the second subdivision of the first section of the said act. Its charter provided that its business should be conducted upon the plan of mutual insurance; that its capital-stock should be at least one hundred thousand dollars, consisting of premium notes and premiums received, and such capital as by the consent of the board of directors should have been added; and that the corporation might, in their discretion, divide applications for insurance into two or more classes, according to the degree of hazard; and the premium notes should not in any such case be assessed for any loss except in the class to which they should belong.

By the fifth section of the act aforesaid, it is provided that no Mutual Insurance Company organized under the act in any county in the State other than the city and county of New York, and the county of Kings, shall commence business until agreements have been entered into for insurance, the premiums on which shall amount to one hundred thousand dollars; and the notes received therefor payable at the end of or within twelve months from date thereof, are to be considered a part of the capital-stock, and are to be deemed valid, and shall be negotiable and collectable for the purpose of paying any losses which may accrue, or otherwise.

* Present, Mason, Balcom, Campbell, and Parker, JJ.

By section 19 of the act, it is provided that notes taken in advance of premiums, under the act, are not to be considered debts of the company, in determining whether a company is insolvent, but are to be regarded as assets of the company.

It is provided in section 11 of the act, that the comptroller of the State shall himself examine, or cause an examination to be made by three disinterested persons, specially appointed by him for that purpose, who shall certify under oath, in the case of a mutual company, that it has received, and is in the actual possession of the capital, premiums, or engagements of insurance, as the case may be, to the full extent required by section 5 of the act; which certificate, together with the charter, is declared to be the authority of the company to commence business and issue policies. The defendant, for the purpose of aiding in the formation of the company, and enabling it to commence business and issue policies, agreed for an insurance upon his property of $1,400, and gave his premium note for the full amount of $1,400, in advance of the issuing of a policy to him, which note was as follows, viz. :

$1,400. For value received in policy No. 407, dated April 1st, 1851, issued by the New York Central Insurance Company, I promise to pay the said company, or their treasurer, for the time being, the sum of fourteen hundred dollars, in such portions and at such time or times as the directors may, agreeably to their charter and by-laws, require.

NATHAN R. BROWN.

Dated April 1st, 1851.

The note was actually made in February, 1851, and the date was then left blank. It was presented to the commissioners, who made the examination required by section 14, and formed in part the basis of their certificate, that the company had received, and was in actual possession of premium notes, based on applications for insurance, to the amount of $100,000, as required by section 5 of the act.

At the time of the making of the note, it was agreed between the defendant and the general agent of the company, with whom the agreement to insure was made, that the note should not be taxed or assessed, but that when the company was organized, it should be returned, and a smaller note,—one for the usual

amount charged for insurance in such companies,—substituted in its place. In pursuance of this agreement, the note was surrendered by the general agent to the defendant, the same or the next year, and a note for $700 substituted for it, which also was subsequently taken up. The general agent testified, in relation to such substitution, and the subsequent settlement of the smaller note, as follows: "The amount of the small note was much larger than the usual notes given for insurance on that kind of property; the company did not wish to reduce the amount of their capital-stock below $100,000. The new or small note was not strictly in conformity with the agreement made at the time the large note was given. I do not know whether $700 was the amount assessed by the company or not. I returned the note to the defendant by the general understanding of the officers and directors of the company. The small note was received and accepted by the company in the place of the large note for $1,400. I annexed the smaller note to the application myself. The small note was annexed to the application by the direction of the president and secretary of the company. I was present when the defendant paid money to the company on the 4th of July, 1855, before the company became insolvent. The defendant paid $230, in four or five cases,—N. R. Brown, Rufus Brown, H. A. Brown, A. E. Arnold, and H. B. Tracy. The money paid was for the purpose of taking up the reduced notes of those persons, and in full satisfaction of said notes. The understanding was, as I understood it, between defendant and the secretary of the company, that it was a full settlement and satisfaction of the small notes, or the liability of the members thereon; this was after the expiration of the policies. There was no formal action taken by the company in relation to these small notes, but the settlement of them was fully understood and authorized by the officers and directors of the company, and the money received by the company. I tore off the large notes and took smaller ones; when the smaller notes were paid no estimate of loss was made." This is all the evidence which the case shows on that subject, except the following instrument in writing, dated October 25, 1851, signed by defendant and several others.

"We the undersigned, being desirous of promoting the permanent success and continued usefulness of the New York Cen-

tral Insurance Company, do severally agree that the premium notes heretofore given to said company by us respectively, shall continue to be held by the treasurer of said company, and liable to be assessed when necessary, according to the rules and practice of mutual insurance companies, for the payment of which assessment we will be severally, but not jointly, accountable, without recourse to any other person, to remain during the continuance of the policies on which said note or notes were given."

In the year 1856 the company was proceeded against in this court as an insolvent corporation, in an action brought against it by Horatio J. Olcott, president of the Central Bank at Cherry Valley, who held a judgment against it, obtained upon loans of money made to it from May 30, 1852, to March 24, 1853 (said Olcott being also a director of said company), and was, on the 6th day of February, 1856, adjudged to be insolvent, and its property sequestered for the payment of its debts; and the plaintiff in this action was, on the same day, appointed receiver of its property and effects, with all the powers and obligations given and imposed by article 3, title 4, of chap. 8, part 3, of the Revised Statutes, and shortly afterwards filed the requisite security, and entered upon the duties of his office as such receiver. The plaintiff, after entering upon the duties of his office, proceeded to ascertain the liabilities of the company, and to assess notes and evidences of debt held by it. He testified, on the trial, that the liabilities of the company amounted to about $30,000, and the assessments to $40,000, he allowing $10,000 for bad debts and expenses of collection;—that the whole amount of notes and evidences of debt upon which the assessment was made was from $115,000 to $120,000; that he assessed $532, to be paid on defendant's note of $1,400, and on the 9th of July, 1856, demanded payment thereof personally of defendant; and he having omitted to pay the same for thirty days thereafter, pursuant to the by-laws, this suit was commenced on the 18th day of August, 1856.

The defendant insists, in the first place, that the plaintiff cannot maintain the action, because he was not duly appointed receiver, and cites Bangs *a.* McIntosh (23 *Barb.*, 591). This case does not come within Judge Smith's opinion in that case; for here the judgment of the court appointing the receiver does

not rest upon the petition provided for in section 36 (2 *Rev. Stat.*, 463, 1 ed.); but an action was brought under section 40, the corporation was served with the summons and complaint, appeared in the action, and consented, in writing, to the judgment by which the plaintiff was appointed receiver. There can be no doubt of his due appointment.

The note in question, when made, became a portion of the original stock of the company, and was absolute and payable at all events without an assessment. This I consider settled by the decision of the Court of Appeals in White, receiver, &c. *a.* Haight (16 *N. Y.* 310, 321). Judge Denio, in giving the opinion of the court in that case, after saying that the note given, pursuant to section 5 of the act of 1849 (and in its terms entirely similar to the one in this case), was absolute and payable at all events, proceeds as follows: "The language of section 5 does not admit of any other interpretation. It seems to me to be chosen with a view to distinguish the notes to be given, from such as should operate merely as guaranties, and require an assessment. They are to be given for premiums, in advance, upon risks contracted to be taken. They are to be considered as capital. They are to be valid, that is, operative of themselves, and not on account of the happening of another event, such as the occurrence of losses. They are to be negotiable, and may therefore be indorsed and transferred by the corporation at its pleasure. And they are to be collectable, and may be sued for and recovered when they have matured. They may, moreover, be transferred or collected not only to pay losses, but otherwise, that is, to obtain money for any other lawful purpose. This language cannot, in my opinion, be otherwise understood than as describing ordinary promissory notes, available for the purposes for which such notes are usually available."

This view of the character of the note disposes of all questions arising in the case respecting the assessment, and justifies the exclusion, on the trial, of all evidence to sustain the third defence set up by the defendant, to wit: that there were two departments, a stock and a mutual department, which were entirely separate, and the one in no way liable for the debts or liabilities of the other; that defendant was insured in the mutual department; and that the losses in that department had been

fully paid by the cash premiums and receipts in that department; and that the liabilities unpaid accrued in the stock department. All this was entirely immaterial, if the note was payable absolutely, at all events, without any assessment. The corporation having been declared insolvent and a receiver appointed, he was entitled to collect the note for the payment of its debts.

The question in the case remaining to be considered is, whether the company was authorized to give up and cancel the note.

It is claimed by the defendant that the arrangement made with King, the general agent, when the note was given, not only authorized the company to surrender the note, but required of them that it should be surrendered and the smaller note taken, after the company became organized. This agreement between the defendant and King I regard as wholly invalid and void. The note being made and taken to aid in the organization of the company, and to enable it to commence business by the issuing of policies, became thereby devoted as a part of the capital-stock of the company, to secure the payment of losses and debts of the company which should accrue during its entire existence. To allow such an arrangement as was made respecting it to be carried out, would operate as a fraud upon those who should become insured by the company, and upon its creditors; and not only so, but a fraud upon the act under which the company was organized. Such an agreement would be clearly illegal, and the carrying of it out by the officers of the company a plain breach of duty on their part. The Legislature in carefully providing as they have done, by the fifth section of the act, that no mutual insurance company shall commence business until agreements have been entered into for insurance, the premiums on which shall amount to one hundred thousand dollars, secured by notes received therefor, of course intended that such notes should be real, and not sham notes, such as this is claimed to be; and a proper construction and enforcement of the act must prevent any such evasion of its intent as is here attempted. In the case of Brouwer, receiver, &c. *a.* Appleby (1 *Sandf. S. C.*, 158), the Superior Court held, in respect to a note given under section 12 of the charter of the Atlantic Mutual Insurance Company, which is similar, in this respect,

to the aforesaid section 5, that the president of the company had no power to make an agreement to give it up at the end of twelve months, which it had to run, and Judge Oakley remarks, that "it is doubtful whether the board of directors could have made such an agreement without a valuable consideration, and in Brouwer, receiver, &c. *a.* Hill (1 *Sandf. S. C.*, 629), the same court expressly held that the board of directors had no such power. The defendant's counsel relies upon the case of the Bank of Lyons *a.* Demmon (*Lalor's Sup. to Hill & D.*, 398), as authority to show that the note might be and was properly surrendered. In that case the defendant gave his note for $1,000 to the bank for ten shares of its capital-stock, of $100 each, with the understanding that he could return the stock and take up his note whenever he desired to do so. And it was held that the understanding having been carried out, and the stock received back by the bank, the receiver of the bank could not maintain an action on the note.

The note in that case was very differently circumstanced from the one in the case at bar; it formed no part of the capital-stock of the bank, and, in the language of the court, the giving of it up upon such an arrangement was not "a fraud upon the stockholders or the public, or a violation of any principle of the common or statute law." In this case, as before shown, the note formed a part of the original capital-stock of the company, expressly made so by the fifth section of the act of 1849, under which the company was organized; and the remark above quoted from the opinion of the court in that case certainly cannot be applied to this; for the surrender of the note in this case was both a fraud upon the insurers in the company and the public, and a violation of an express statutory provision. The act of 1849 subjects all companies formed under it to all the provisions of the Revised Statutes in relation to corporations, so far as the same are applicable; under art. 1, title 2, of chap. 18, of the first part of the Revised Statutes, the directors of moneyed corporations are prohibited from doing the very thing which was done in this case. The first section of that article provides as follows:

§ 1. It shall not be lawful for the directors of any moneyed corporation, 1. To make dividends, &c.

2. To divide, *withdraw*, or in *any manner pay* to the stock-

holders, or any of them, any part of the capital-stock of the corporation, or to *reduce* such capital-stock without the consent of the Legislature."

And by the third article of that title it is provided that the term "moneyed corporation," as used in the title, "shall be construed to mean every corporation having banking powers, or having the power to make loans upon pledges or deposits, or authorized by law to *make insurances*." The surrender of the note was *withdrawing* so much as it represented of the capital-stock of the company, which could not legally be done. The note, therefore, could not be given up and cancelled without an equivalent. This prohibition is absolute, not conditioned that the corporation shall be left solvent, or with a specific amount of capital. It matters not, then, whether the company was solvent when the note was cancelled, nor whether it had remaining a capital of $100,000. Those who insured in the company after it commenced business, and gave their premium notes, had a right to look to the original capital with which it started for their security; and to allow that original capital to be withdrawn, even if a like amount should have been received and accumulated, in subsequent premium notes, would be a fraud on the makers of such subsequent notes, and would be, at all events, equally within the prohibition of the statute.

If I am correct in the above conclusions, it follows that the defendant was not released from his obligation to pay the note by its illegal surrender; and that the receiver may maintain an action upon it. (See 3 *Seld.*, 328, 346; 1 *Sandf. S. C.*, 629.) There was no legal defence made to the note, and the court was right in refusing to nonsuit, and in directing a verdict for the plaintiff.

Judgment should therefore be given for the plaintiff on the verdict.

BALCOM, J., dissented.