## SPRUANCE, AUDITOR, EX REL. THOMAS, V. FARMERS' AND MERCHANTS' INSURANCE CO.

1. The insurance statute of Colorado contains no provision requiring mutual assurance associations to have or to accumulate a capital or reserved fund, beyond the amount necessary to defray current losses and expenses. Nor does it specify any particular method by which such companies shall make contracts and take risks. This subject is left to be determined by the association itself; the only limitation being that the plan chosen must include the principle of mutuality.

2. The principle of mutuality exists when the persons constituting the company contribute either cash or assessable premium notes, or both, as the plan of transacting business may provide, to a common fund, out of which each is entitled to indemnity in case of loss. It is perfectly consistent with this principle to transact business upon the plan of full paid cash premiums.

3. But the superintendent of insurance has almost unlimited power in the investigation of the affairs and management of these companies.

ORIGINAL agreed case.

In the year 1883 the Farmers' and Merchants' Insurance Company was duly organized as a mutual fire insurance association under the following section of our insurance statute:

"The provisions of this act shall not be construed to prevent any number of persons, not less than twenty, from associating together for the purpose of forming an incorporated company for the purpose of mutual insurance of the property of its members. When persons so

associated shall have complied with the provisions of this act, so far as [they] are applicable to such mutual companies, the superintendent of insurance shall commission the persons named in the certificate of incorporation, or a majority of them, to open books, to receive propositions and enter into agreements in manner. hereinafter specified. But no company.so organized shall commence business until *bona fide* agreements have been entered into for insurance with at least one hundred individuals, covering property.to be insured to the amount of not less than $50,000."

The association commenced the transaction of business, using both the assessment and cash plans for the payment of premiums for insurance. In the year 1884 the superintendent of insurance, on examination, discovered that the company was in an insolvent condition, the receipts having been absorbed by the management, so that nothing remained with which to pay losses; nor was indemnity against loss in any manner provided.

Upon a reorganization of the company, the following resolutions were adopted by the policy-holders as embodying the plan upon which the business should be transacted:

"Resolved, that, for the purpose of equitably and mutually indemnifying each other, and that each member shall be required to do and perform his part, to the end that all may be equally and mutually benefited, each member shall pay in as premium at a ratable percentage on the amount of insurance obtained by each, varied as the risks may vary in hazard, based upon the maximum cost of insurance, and such percentage of rates to be established and designated by the manager and secretary. of this association on the foregoing basis; and that each policy-holder, upon becoming a member, be required to pay in such stated sum upon insurance received in cash, note or notes for the amount, to be paid within a reasonable time, subject to all the conditions, rules and regulations

adopted by the company: provided, that the amount so received shall be in full of all individual liability upon the part of each member.

" Resolved, further, that, should the aggregate amount of percentage deposited by each member and all of the policy-holders amount to a greater sum than may be necessary to pay all expenses and losses from time to time, and to pay all accruing losses and expenses upon all unexpired risks, that such unneeded surplus on hand shall from time to time be, by the board of directors, equitably and mutually distributed among the policy-holders at the time of such distribution in proportion to their respective ratable interests in such surplus.

"Be it further resolved, that the board of directors be, and are hereby, requested to so alter or modify the existing by-laws as to conform them to the manner of conducting the business of the company as in these resolutions expressed."

At the commencement of this action the association had upwards of two thousand members, who became such, under these resolutions, by paying cash premiums in full of their insurance, and in full of all liability. The proceeding in this court is in pursuance of the statute providing for agreed cases. It is conceded in the agreed statement that the affairs of the company, since its reorganization, have been ably managed, and that it is now in a condition perfectly satisfactory to the superintendent of insurance. The object of the parties in instituting the proceeding is to determine whether, under the laws of Colorado, an insurance company, the membership of which consists of the policy-holders, can do business upon the plan provided in the foregoing resolutions.

Attorney-General THEO. H. THOMAS, THORNTON H. THOMAS, of counsel, for plaintiff.

Mr. B. F. MONTGOMERY, for defendant.

HELM, J.    The purpose of the legislature in providing for the organization and maintenance of a state insurance department was to protect the interests of the large number of persons within the state who patronize corporations engaged in the business of insurance.    Both joint-stock companies and mutual associations are recognized.    As to the former, the object of the statute is accomplished in two ways: *First*, through the supervision and authority therein conferred upon the superintendent of insurance; and, *second*, by the provisions making an actual paid-up cash capital of at least $200,000 a prerequisite to the transaction of business, and carefully guarding the investment or loan thereof.    The statutory requirements relating to such paid-up cash capital do not apply to mutual associations.    Neither are there any corresponding sections providing for a reserve fund in connection with the latter class of companies.    It is the customary, if not the universal, rule elsewhere to specify in statutes authorizing the organization of mutual associations the leading features of a plan upon which they shall take risks and conduct business.    This plan generally includes specifications relating to a capital or reserve fund, either in the hands of the members and represented in the treasury by assessable premium notes, or in the hands of designated officers.    The statute before us, however, is surprisingly deficient in this particular.    The only section thereof referring by name to mutual companies organized after its passage contains a statement showing that the legislature intended to make such provision, at least so far as to specify the manner of entering into agreements; but either by reason of inadvertence, or a subsequent change of purpose, this subject was left wholly uncovered.

Since the method of taking risks in the mutual association is not declared by statute, and since it is not required to be stated in the articles of incorporation, its selection is left to the company itself; and the only lim-

itation affecting the plan which may thus be chosen is that it shall include the principle of mutuality. We need hardly suggest that an association which did not embrace the foregoing principle would not be a "mutual" company within the meaning of the statute. An important inquiry at this juncture, therefore, is, what are the essential elements involved in the recognition of this principle? We answer that the principle of mutuality exists when the persons constituting the company contribute either cash or assessable premium notes, or both, as the plan of transacting business may provide, to a common fund, out of which each is entitled to indemnity in case of loss. *Union Ins. Co. v. Hoge*, 21 How. 35; *Mygatt v. New York Protection Co.* 21 N. Y. 52; *Ohio M. Ins. Co. v. Marietta Woolen Factory*, 3 Ohio St. 348; *White v. Haight*, 16 N. Y. 310; May, Ins. § 548, citing three of the foregoing cases; Ang. Ins. § 413.

Persons so associated are said to be members of the company. They have, or may have, a voice in the management of its affairs and are practically both insurers and insured. All are interested in what may be termed the profits and losses of the association; for if the assessable note system in any of its forms be adopted, the demands upon each member to meet assessments, during the life of his policy or risk, are large or small, according to the multiplication or diminution of losses; while, if a cash premium plan prevail, each member has an interest in the surplus premium fund remaining after payment of losses and expenses; and, of course, the amount of such surplus is governed by the extent of the losses suffered. The policy-holder in the joint-stock company is not thus situated. He pays a certain definite sum as premium, and the company agrees therefor to pay him a certain specific amount in case of loss. He has no voice whatever in the management of the business, and whether the profits or losses are large or small does not concern him, provided the company remains able to liqui-

date any losses contemplated by his contract.  See authorities cited *supra*.  The principle of mutuality has. probably been more often recognized and enforced in these associations through the assessable note system in some of its numerous forms; but, as shown by the foregoing suggestions and authorities, it is perfectly consistent with the payment of cash premiums.  The latter method of making contracts and taking risks has been and is extensively recognized in the United States; and. sometimes the same mutual company is authorized by statute to invoke both methods in the transaction of its business.  "The present tendency is to pay the entire amount (of premiums) in cash."  Bliss on Life Ins. § 427. A different position concerning the consistency with the mutual principle of doing business upon a purely cash basis seems to be announced in *Illinois Fire Ins. Co. v. Stanton*, 57 Ill. 354.  But, with all due respect to the able court promulgating that opinion, we think that the view above taken is supported by the weight of authority and also by the better reason.

The conclusion seems to be inevitable, that, as the law now stands, mutual associations, organized under section 1704 of the General Statutes, may do business upon a cash premium plan.  The objections of the attorney-general are not without force, but, in view of the circumstances, we do not deem them controlling.  It is true that premium notes represent a reserve fund in the hands of the members; and that, under this method of doing business,. there is therefore a kind of capital as security against. losses.  It is also substantially true that when the premiums are paid in cash there is not, in the absence of legislation, necessarily any such fund or indemnity; a majority of the members or a majority of the directors may do with the surplus of such premiums, remaining after the payment of current losses and expenses, as they shall deem advisable.  They may from time to time return the same to the members, or jeopardize its loss through unwise loans.

and investments. It would be more in harmony with the spirit of the act to suppose that the legislature intended mutual companies to have some sort of a reserve fund at the date of the organization, or thereafter to accumulate the same. But, as already suggested, this purpose may be, and usually is, effectuated under both methods of making contracts. Therefore, supposing the legislature intended to require that mutual companies do business upon one only of the foregoing general plans, how shall we determine which of the two would have been selected? The act itself contains nothing that points with reasonable certainty to either as being the exclusive choice. Our opinion in the matter might not correspond with the legislative judgment, and our selection might represent the converse of the legislative intent. Besides, our action, in such case, would savor more strongly of judicial legislation than of judicial interpretation. It would be supplying something which the legislature, whatever may have been its purpose, did not include in the act. Nor do we feel at liberty to hold that the superintendent of insurance is clothed with authority to supply the missing statutory provision. To say that he may prescribe the plan upon which mutual insurance risks shall be taken would be to authorize what might appropriately be termed executive legislation; for, though clothed with a sort of judicial power, he is essentially an executive officer.

But while mutual associations organized to insure against loss of property are not required by the law to have, or to accumulate, a reserve fund beyond the amount reasonably necessary to meet current losses and expenses, in order to do business within the state, they are subject to all provisions of the act that may be found "applicable." They must make annual reports to the superintendent of insurance, showing their assets, liabilities, moneys received and expended, character of business, etc. The superintendent of insurance has almost unlimited power

in the investigation of their affairs and management. Until they have complied with the law, he should refuse permission to transact business; and the privilege being granted, if they disobey the law, or become financially unsound, he must revoke the same. In passing upon such financial condition, the superintendent will take into consideration all appropriate *data*,— such, for instance, as the amount of cash received, and the balance on hand; the manner of loaning or investing surplus premiums, having reference to section 1695, Gen. Stats., the first part of which, at least, is applicable; the extent of the business transacted, including the number and character of risks taken; the running expenses; probable losses upon unexpired risks, as well as losses accrued, etc.

It is, of course, true that the protection thus given the assured is not so complete as that provided in the case of joint-stock companies; but it is likewise true that if the officer mentioned performs his duty in the premises, no great hardship or injury is likely to result prior to the next session of the legislature. Then the omission, if unintentional, may be rectified by that branch of the government in which is lodged the power of enacting laws.

The question propounded by the parties is answered, and judgment will be entered accordingly.