GEORGE S. TUCKERMAN, Receiver of N. Y. Central Insurance Company, *v.* NATHAN R. BROWN.

A note given for the purpose of complying with the provisions of the 5th section of the act of April, 1849, and forming a part of the original capital of the company contemplated by such act, is payable absolutely, without alleging or proving any loss or assessment by the company, &c.

Where such note is given for the purpose of increasing the capital stock of the company to the amount required by law, that it may pass the necessary examination of the commissioners to be appointed by the comptroller, upon an agreement that, after such examination, such note may be withdrawn and a lesser one be substituted therefor, such transaction and agreement is a fraud upon the law, and the maker of the note will continue to be liable thereon, though such note be withdrawn and destroyed.

APPEAL from judgment of Supreme Court.

The action was brought by the receiver of the N. Y. Central Insurance Company (a corporation organized in 1851, under the general law of 1849), to recover the amount of a note in the following words:

"$1,400. For value received in policy 407, dated 1st April, 1851, issued by the New York Central Insurance Company, I promise to pay the said company, or their treasurer, for the time being, the sum of $1,400 in such portions and at such time or times as the directors may, agreeably to their charter and by-laws require. Dated April 1st, 1851.

(Signed)            NATHAN R. BROWN."

The complaint averred that the note formed part of the capital stock of the company; that the policy therein mentioned was issued to the defendant at or about the date of the note; that the note was assessed by the plaintiff to pay the losses and liabilities of the company to the amount of $535, which amount was demanded personally of the defendant; and that he had neglected to pay said assessment. Judgment was demanded for the amount of the note, with interest.

The answer admitted the making of the note set out in the complaint, but alleged that it was executed and delivered by and in pursuance of a special agreement thereafter stated, and not otherwise.

TIFFANY. — VOL. VI. ·   38

It is then averred as a defense, that about 20th March, 1851, one King, the then general agent for the company, made the following agreement with the defendant for the company, to wit: "The said company being about to commence business and issuing policies, and being desirous of obtaining premium notes for as large an amount as possible, proposed to insure the property of the defendant to the amount of $1,400 for three years, on the following terms: This defendant to give, for the time being, his note for the full sum of $1,400, with the express understanding and agreement that said note was not to be assessed or collected, or the defendant called upon or required to pay it or any part thereof, but that the said note, after the company became organized, and within a few months after the giving of the same, was to be canceled and given up to the defendant, and the defendant to make and deliver in the place thereof, and substitute therefor another note for a smaller amount, and for such an amount or sum as was usually charged for insuring such property in mutual insurance companies. That the defendant gave his said note, and the company subsequently issued the said policy in pursuance of said agreement, which is the same note and policy mentioned in the complaint. That about the 20th July, 1852, in pursuance of such agreement, and in consideration of another note given by defendant for a smaller sum, the said company did cancel and give up said note of $1,400 and interest, and delivered the same to the defendant. That at the time said note was canceled and given up, as aforesaid, the same had not been assessed, nor had the defendant been required or become liable to pay the same, or any part thereof. That the said small note given and substituted for the original note of $1,400, has since, and some time in the month of July, 1855, been paid, satisfied and given up to the defendant."

It was alleged as a *second* defense, that during the time the defendant's policy had to run, the losses and expenses of the company were fully paid and satisfied by the cash premiums and receipts of said company in the mutual department thereof, in which department the defendant was

insured. That if there were any losses or expenses unpaid, accruing during said term, the same were in the stock department (meaning a department where the policies were issued for a cash advance premium without a premium note), and not in the mutual department (meaning a department where the policies were issued for a premium note), and for which the deposit or premium note given by the defendant was not and is not liable to be assessed to pay the same or any part thereof.

The cause was tried at a Circuit Court held in the county of Otsego, in July, 1858, before Mr. Justice MASON and a jury.

The plaintiff gave in evidence: 1st. An exemplified copy of a judgment roll, filed February 29, 1856, declaring the company insolvent and appointing the plaintiff receiver, &c. 2d. An exemplified copy of the receiver's bond approved by the referee June 18, 1856, and filed June 20th, 1856. 3d. Exemplified copy of declaration of intention to form the company. 4th. Charter of the company, with the certificate of the attorney-general under date of October 28th, 1850, that the charter and declaration were made in accordance with and in pursuance of the act of April 10th, 1849, and are not repugnant to any of the provisions of the Constitution and laws of the State. 5th. Appointment by comptroller, 22d March, 1851, of commissioners to make an examination of the capital, securities and affairs of the company. 6th. Verified certificate of the commissioners, dated April 3d, 1851, that they had made such examination, and that the company has received and is in actual possession of premium notes based on applications for insurance to the amount of $100,000. 7th. Certificate of comptroller that the company is possessed of an amount of capital to the amount specified in the fifth section of the act entitled "An act to provide for the incorporation of insurance companies," passed April 10th, 1849.

William S. King was then called as a witness, and testified: I saw defendant sign the application (application No. 407 shown to him); there was a note signed by defendant attached

to this application for $1,400; I tore off the note and gave it to the defendant; I think the note was given in February, 1851; I was the general agent of the New York Central Insurance Company at the time the note was taken to Cherry Valley and presented to the commissioners, and formed part of the capital stock of the company, and passed over to the secretary of the company for safe keeping; I can't tell exactly the time that I gave up and surrendered the note of $1,400 to the defendant; in 1851 or 1852, I surrendered the note in pursuance of an agreement made with the defendant at the time the note was given that the same should not be taxed or assessed; that when the company was organized the note should be returned, and a smaller note, one for the usual amount charged for insurance in such companies, substituted in its place. (It was here admitted by the defendant that a policy was issued on the application.) At the time the $1,400 note was surrendered and the smaller note given, the policy was not changed; the small note that was given when the large one was surrendered and the one now attached to the application, was for $700. (Plaintiff here offered in evidence the application, which was received and read in evidence.) The note for $1,400 was dated in blank when taken; there was no money paid when the original note was given up and surrendered.

*Cross-examined:* The amount of the small note was much larger than the usual notes given for insurance for that kind of property; the company did not wish to reduce the amount of their capital below $100,000; the new or small note was not strictly in conformity with the agreement made at the time the large note was given; I do not know whether $700 was the amount assessed by the company or not; I returned the note to the defendant by the general understanding of the officers and directors of the company; the small note was received and accepted by the company in the place of the large note for $1,400; I annexed the smaller note to the application myself; the small note was annexed to the application by the direction of the president and secretary of the company; I was present when the defendant paid

money to the company, on the 4th July, 1855, before the company became insolvent; the defendant paid $230 in four or five cases, N. R. Brown, Rufus Brown, H. A. Brown and H. B. Tracy; the money was paid for the purpose of taking up the reduced notes of those persons, and in full satisfaction of said notes; the understanding was (so I understood it) between defendant and the secretary of the company, that it was a full satisfaction and settlement of the small notes, or the liability of the makers thereon; this was after the expiration of the policies; there was no formal action taken by the company in relation to those small notes, but the settlement of them was fully understood and authorized by the officers and directors of the company, and the money received by the company; I tore off the large notes and took smaller ones; when smaller notes were paid no estimate of loss was made.

It was proved that on the 25th October, 1851, the defendant, with others, entered into an agreement with the company, wherein they state that they " being desirous of promoting the permanent success and continued usefulness of the New York Central Insurance Company, do severally agree that the premium notes heretofore given to said company by them, shall continue to be held and liable," &c. To this paper is affixed the name of the defendant, the number of his note, 407, and the amount, $1,400.

An exemplified copy of a judgment roll, in the suit of the Central Bank at Cherry Valley, against The New York Central Insurance Company, was then read in evidence; the judgment was for $9,434.39; was docketed December 8, 1855, and was the judgment on which the creditor's suit was founded.

After proving that the liabilities of the company amounted to over $30,000, and that after the receiver was appointed he made an assessment on the $1,400 note of $532, the plaintiff rested.

The counsel for the defendant moved the court to nonsuit the plaintiff, on the ground that the evidence is insufficient to sustain the action. Also, on the ground that the evidence shows the note on which the action is brought had been given

up, canceled and surrendered for a valuable consideration by the company before it became insolvent. The motion was denied and an exception taken.

The defendant then offered to show and prove the matter contained in defense No. 2, in his answer, and also that the company had mortgages to a large amount ($35,000), which had been given up and not assessed 'by the receiver, &c. Objected to by plaintiff, on the ground that it constituted no defense to the action. The objection was sustained, and the defendant excepted.

Defendant offered, under plaintiff's objection as immaterial, the small note given by defendant at the time the large note of $1,400 was surrendered; amount of note $700.

It was admitted that the suit was commenced on the 18th August, 1856.

The evidence here closed and the judge directed the jury to find a verdict for the plaintiff for the amount of the note, viz., $1,400, with interest from the 18th August, 1856, the time the action was commenced. The defendant's counsel objected to the direction of the judge, and claimed that the defendant was entitled to the verdict of the jury. That no cause of action has been proved or shown. That the cause should be submitted to the jury. The judge overruled the objections, and the defendant excepted, and the jury, as directed, rendered a verdict for $1,583.13.

The judge ordered all proceedings on the verdict to be stayed, and the exceptions to be heard in the first instance at General Term.

The General Term denied a new trial, and ordered judgment on the verdict for the plaintiff. From this judgment the defendant appeals.

*H. R. Mygatt*, for the plaintiff.

*L. J. Burditt*, for the defendant.

WRIGHT, J. The note on which the action is brought was made by the defendant for the purpose of assisting to form the New York Central Insurance Company, under the gen-

eral statute of 1849, providing for the incorporation of insurance companies. (Laws of 1849, ch. 308.) This, if not in terms admitted in the defendant's answer, indisputably appeared by the evidence adduced on the trial. The preliminary steps had been taken, under the act in October, 1850, to organize the company on the mutual plan of insurance. Notice of the declaration of intention to form the same had been given and the charter agreed on, approved by the attorney-general, and filed with the secretary of State. Before, however, the organization was complete, and the company authorized to commence business, it was required by the act that agreements for insurance should have been entered into, the premiums on which should amount to $100,000, and that notes should have been received for such premiums. (§ 5.) These advance notes are declared capital stock, valid, negotiable, and collectible, for the purpose of paying any losses which may accrue, or otherwise. In February, 1851, the defendant agreed for insurance, and gave the company the note sued on for the premium. The comptroller, in pursuance of the 11th section of the act, having subsequently appointed commissioners to make an examination of the capital, securities and affairs of the company, and report the result thereof, the defendant's note (its date being then in blank) was produced to them, and was one of the notes forming, in part, the basis of the certificate on oath, of the commissioners "that the company has received and is in actual possession of premium notes based on applications for insurance to the full extent required by the fifth section of the act of April 10, 1849, to wit, to the amount of $100,000." That it was made to be so used, and was one of the original "stock" notes given for the express purpose of aiding in the formation of the company, was thus conclusively shown, and, in fact, was not denied, either in the pleadings, or on the trial. The defense alleged and attempted to be made available was, not that such was not the character of the note, but that by a special agreement between the defendant and the agent of the company, at the time of the agreement for insurance, the same was not to be taxed or assessed, but when the company

was organized, returned, and a smaller note (one for the usual amount charged for insurance in such companies) substituted in its place; and that in pursuance of this agreement the note was surrendered the same or the next year, and one for $700 substituted for it, which latter note was, in July, 1855, paid and given up to the defendant.

The note, then, being confessedly one made for the purpose of complying with the provisions of the fifth section of the act of April, 1849, and formed a part of the original capital of the company contemplated by such act, it was payable absolutely, and was collectible to the full amount specified therein, without alleging or proving any loss or assessment by the company or the receiver. In *White, Receiver,* v. *Haight* (16 N. Y., 310), this court determined this to be the nature and character of a note in the precise form of the present one, and given and used under similar circumstances. It was unnecessary that the receiver should have alleged and proved, as he did, an assessment of the note to pay losses and expenses, and the offer to show that the defendant was insured in a department of the company in which the losses were fully paid, and that his note was assessed to pay losses in the stock department (meaning a department where the policies were issued for a cash advance premium only), was wholly immaterial. The note was absolute, and payable at all events, without an assessment.

There is, therefore, really but one question in the case, viz., whether the surrender and cancellation of the note by the officers of the company after its organization, in pursuance of an agreement between the defendant and its agent when given, constituted any defense to an action by the receiver to enforce it. I think it did not. The fraudulent nature of the transaction relied upon to avoid its payment, is unmistakable, and, if successful, would be a reproach upon the law. The company could not organize and commence business until it had received and actually possessed premium notes, based on applications for insurance, to the amount of $100,000. To effectuate this end, the defendant became an applicant for insurance, and gave his note of $1,400 for the premium,

which note was subsequently used, and formed in part, the basis of the certificate of the comptroller, that the company was possessed in good faith of an amount of capital equal to the amount specified in the fifth section of the general law. The object to be attained by the application and note was well understood by the defendant. He was in no way deceived or misled as to that object. Upon the organization of the company (which was about 1st of April, 1851), a policy was issued to him. The application and note attached thereto remained in the custody of the corporation until some time in 1851 or 1852 (the precise date does not appear), when its general agent, with the assent of its officers and directors, returned the note to the defendant, substituting in place thereof, and attaching it to the application, a note for $700, the policy remaining unchanged. This is claimed to have been done in pursuance of, and to carry out an agreement between the defendant and the agent, made at the time the note was given, to the effect that when the company was organized the note should be returned, and one for the usual amount charged for insurance in mutual insurance companies substituted in its place. It is conceded that the agreement was not strictly performed, the $700 note substituted being much larger than the usual guaranty note given upon insurance of property like that covered by the defendant's policy; but the reason assigned for this deviation is, that the company did not wish to reduce its capital below $100,000. Subsequently to this change of notes, and in July, 1855, the defendant paid to the secretary of the company $230 in full satisfaction and settlement of his liability as maker of the $700 note, and also the liability of four other persons as makers of original notes that had been taken and reduced in a similar way. These notes were originally given for over $8,000. There was no formal action taken by the company in relation to this settlement of the reduced notes, but it was fully understood and authorized by its officers and directors, and the money paid to, and received by it.

Such a transaction has no justification in law. Of the brood of insolvent corporations launched upon the com-

munity under the provisions of the general act providing for the incorporation of insurance companies, many, doubtless, from the beginning, were unworthy the public confidence, but none, perhaps, were ever organized or carried on by or through the perpetration of a grosser fraud than the one whose origin and short career this case discloses. The defendant's note, as is seen, was by no means the only one imposed on the commissioners as the *bona fide* capital required by the act, and that were subsequently reduced and finally canceled and given up to the makers for a nominal consideration. There were at least four others, arranged and settled by the defendant himself, and from the fact that after a brief existence the sham organization exploded, the inference is reasonable that there were more of a like description. That the defendant aided and abetted the fraud of the officers of the company is very manifest, although not an officer himself. He was a party to an engagement to insure his property, giving a premium note five times greater than the ordinary amount charged for insurance by companies organized on the mutual plan, knowing that such note was to be used to constitute in part the capital required to perfect the organization and obtain the necessary authority to issue policies. In truth, the note was never intended as anything more than a sham, being given with the express understanding that after being exhibited to the commissioners as evidence that the company had complied with the law, and the company had legal existence, it should be returned to the defendant, and one for a smaller amount take its place, which arrangement, in the order of events, was duly consummated. It is idle, in view of these circumstances, to allege or pretend that the defendant was unwittingly misled or deceived by any one, or an unwilling abettor of the fraud of the corporation or its officers. In fact the note was surrendered and canceled in accordance with the fraudulent agreement entered into by the parties at the time it was given, and it is this executed agreement that is now relied upon as the ground of defense; for there is no pretense that such surrender or cancellation was for any valuable consider-

ation given or paid the company whilst solvent, if it ever was in that condition.

Clearly a defense of that kind rests on no legal foundation. It is an attempt to set up the violation of an express statute, and the fraud of the parties in bar of a recovery. Even had the defendant been guiltless of any fraudulent intent in the matter it would have availed nothing. He did not pay his note, but the same was canceled and given up in execution of an illegal and void agreement. There is no mistaking the purpose of the legislature, or the end to be attained by the provision that advance premium notes, like that given by the defendant, to the amount specified in the act, should be received and held by a mutual insurance company, before it commences the business of insurance. That purpose was to afford better security to members and policy holders than they would otherwise have, by requiring such company to possess a fund or securities in the nature of invested capital, immediately available for the payment of losses. To effect this it was provided that these notes for premiums in advance upon risks contracted to be taken before the company has legal existence, should be considered capital; were to be deemed valid, that is, operative of themselves; might be negotiated or transferred by the corporation at pleasure; or sued for and recovered at their maturity; in short, they were invested with all the characteristics of absolute and actual securities for the money mentioned in them. An agreement like that shown in this case, to surrender one of these notes upon the organization of the company, is plainly void; and its surrender and cancellation in pursuance thereof, by the corporation (irrespective of the fact of being a violation of an express statute), a fraud on its policy holders and creditors. In *Brown, Receiver*, v. *Appleby* (1 Sandf. S. C., 158), an agreement by the president of a specially chartered mutual insurance company, on receiving a note made in advance for the better security of dealers, that it should be given up at its maturity, was held void; and in *Brouwer, Receiver*, v. *Hill* (1 Sandf. S. C., 629), it was held that a note of that description cannot be given up to the maker without consid-

eration, even by the board of trustees of the company, and if so given up, a receiver of the company's effects may recover it from such maker. The first mentioned decision is said to have been affirmed in this court, but whether so or not, it is clearly correct, both on principle and authority. A surrender without consideration, and in violation of law, of one of these notes given for premiums in advance (the object of them being the better security of dealers with the company), being a fraud upon its creditors and parties insuring in it, a receiver of its effects, in case of insolvency, may treat such surrender as void, and recover the amount of the security.

I am of the opinion, therefore, that the plaintiff, as receiver of this insolvent corporation, was entitled to recover the amount of the defendant's note. The exceptions having any materiality, were to the refusal to nonsuit, and the direction of a verdict by the judge. If the view taken of the case be the correct one, the nonsuit was properly denied; and as the facts were undisputed, leaving no question for the jury, the direction of the verdict was not error.

The judgment of the Supreme Court should be affirmed.

POTTER and BROWN absent; CAMPBELL takes no part.

Judgment affirmed.